# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARDURRA GROUP, INC., | : | CIVIL ACTION |
| Plaintiff/Counter Defendant, | : | |
| v. | : | No. 19-3238 |
| DANIEL GERRITY, | : | |
| Defendant/Counter Claimant. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                             **DECEMBER 9, 2019**

Plaintiff Ardurra Group, Inc. ("Ardurra") filed a motion for preliminary injunction against Defendant Daniel Gerrity ("Gerrity"), a former employee, on July 25, 2019. (Doc. No. 2.) Ardurra sought to immediately enjoin Gerrity from (1) working for or on behalf of a directly competitive entity in violation of applicable restrictive covenants, (2) soliciting or attempting to solicit or induce current and prospective Ardurra clients and business partners, and (3) use of Ardurra's confidential and proprietary information for the benefit of third parties, namely Bernhard Capital Partners ("Bernhard Capital") and associated entities. (Pl.'s Mem. Law in Supp. Mot. Prelim. Inj. 1.)

On August 8, 2019, a hearing was held on Ardurra's motion for preliminary injunction. (Doc. No. 18.) At the hearing, Gerrity provided testimony and Ardurra submitted the declaration of Kevin Brown ("Brown"), Ardurra's Director of Human Resources, along with the relevant portions of the Unit Purchase Agreement ("Purchase Agreement") and the King Engineering Associates Inc. Employee Propriety Information and Inventions Assignment Agreement ("Employee Agreement"). During the hearing, Ardurra argued that Gerrity breached the

Purchase Agreement and Employee Agreement through his work for Bernhard Capital, an investment firm which Ardurra believes directly competes with, or provides assistance to entities that directly compete with, Ardurra in several aspects of its environmental engineering business. *See, e.g.*, Hr'g Tr. 8/8/19, 6:3–7; 6:18–7:17. Gerrity contended that his work for Bernhard Capital was separate and distinct from his work at Ardurra and did not compete with Ardurra. *See, e.g.*, *id.* at 24:2–4. Alternatively, Gerrity argued that the scope of both of the agreements was overbroad and should not be read to encompass his current role at Bernhard Capital. *See, e.g.*, *id.*

For the reasons discussed below, at the close of the August 8, 2019 Hearing, the Court entered an Order in favor of Ardurra enjoining Gerrity from working in any manner in breach of the Purchase Agreement and Employee Agreement. (Doc. No. 11.) Following a Motion for Reconsideration filed by Arudurra, the Court amended its Order on September 9, 2019, broadening the prohibition of Gerrity "from being employed by or performing work for or on behalf of Bernhard [Capital] and its portfolio and related companies and funds." (Doc. No. 23.)

## I. BACKGROUND

### A. THE PARTIES AND RELEVANT AGREEMENTS

1. Ardurra, formerly known as King Engineering Associates, Inc., is an engineering and construction services company that sells services to public and private entities throughout the United States and abroad. Ardurra's focus is infrastructure, including civil, water, wastewater, solid waste, transportation, traffic, land planning, ecological, landscape architecture, land surveying, and construction management. (Pl.'s Mot. Prelim. Inj., Decl. of Kevin Brown in Supp. Pl.'s Mot. Prelim. Inj. ("Brown Decl."), ¶ 4.)

2.      Gerrity is the former Head of Sales at Ardurra and was a member of the Board of Directors. (*Id.* ¶ 10.)

3.      Gerrity was previously the CEO of Ardurra Group, LLC ("Ardurra Group") and its second largest shareholder. (*Id.* ¶ 7.)

4.      On October 18, 2017, King Engineering Associates, Inc., Ardurra Group (through its holding company Ardurra Group Holdings, LLC), and Durra Holdings, LLC, entered into the relevant Purchase Agreement to sell Ardurra Group to King Engineering. (*Id.* ¶ 8.) Gerrity was instrumental in the decision to sell Ardurra Group and was intimately involved in the negotiation of the purchase price and terms of the transaction. (*Id.*)

5.      The purchase price was $19.2 million. (*Id.*) Gerrity received $4,330,854.00 from the sale proceeds. (*Id.*)

6.      Following the close of the sale, Gerrity signed the Employee Agreement with the new Ardurra entity in conjunction with starting his new position as Head of Sales. (*Id.* ¶ 10.)

7.      The Purchase Agreement contained a four-year non-compete and non-solicitation agreement. Hr'g Tr. 8/8/19, 5:10–15. The Employee Agreement contained a one-year non-compete and non-solicitation agreement, effective upon the end of employment at Ardurra. *Id.*

8.      Under the Purchase Agreement, Gerrity was prohibited from directly or indirectly engaging in or assisting others in engaging (whether through employment, consultation, advisory services, representation on a board of directors or other similar governing body or by any financial or other investment in) any line of business in which Ardurra or its related entities were engaged. *Id.* at 4:8–25.

9.      Under the Employee Agreement, Gerrity was prohibited from using or disclosing Ardurra's Proprietary Information for any purpose other than advancing Ardurra's interests. (Brown Decl. ¶ 15.) Proprietary Information included, without limitation, any and all confidential and/or proprietary knowledge, data, information, or trade secrets. (*Id.*) Such information included the identity of and information regarding Ardurra's vendors, suppliers, contractors, subcontractors, customers, identified prospective customers, the existence of any business discussions, negotiations, or agreements between Ardurra and any third party. (*Id.*)

10.     On March 28, 2019, Ardurra terminated Gerrity's employment. (*Id.* ¶ 21.)

11.     Shortly after his termination, and well within the restricted periods of the Purchase Agreement and the Employee Agreement, Gerrity began working at Bernhard Capital in June or July 2019. Hr'g Tr. 8/8/19, 36:4–7.

12.     Upon learning of Gerrity's new position, Ardurra filed suit for breach of contract and tortious interference on July 25, 2019. (Doc. No. 1.)

### B.      GERRITY'S ROLE WITH BERNHARD CAPITAL

13.     Gerrity joined Bernhard Capital to help build an "infrastructure fund," which works with institutional investment funds to identify distressed utility entities in need of financial assistance. Hr'g Tr. 8/8/19, 42:20–43:24.

14.     Gerrity's initial role is to assess how additional capital would benefit various entities. *Id.* at 44:10–19.

15.     This new fund will look to defease an entity's debt through issuing municipal bonds, when possible, or by paying it outright. *Id.* at 54:19–55:16. It will attempt to improve revenue generating procedures, such as bill collection and metering practices. *Id.* Finally, it will set up a

4

financial repayment plan for the entity. *Id.* Notably, at the time of the August 8, 2019 Hearing, the fund was not yet fully operational.

16. However, Bernhard Capital is more widely known for being a private equity firm that invests in, advises in, and helps actively consult and advise infrastructure businesses. *Id.* at 12:3–8.

17. Bernhard Capital acquires or starts infrastructure businesses and will provide money, advice, industry introduction, client contacts, and industry expertise to help these businesses succeed. These "portfolio companies" are part of Bernhard Capital's "service fund." *Id.* at 12:7–21.

18. Bernhard Capital's portfolio companies are engaged in services such as disaster recovery, water/wastewater engineering, water resources engineering, and/or construction management. (Brown Decl. ¶ 37.)

19. Ardurra is also actively involved in these services and could be in direct competition with many of these portfolio companies. (*Id.* ¶ 38.)

20. According to Gerrity, the infrastructure fund does not participate in providing engineering funds. The infrastructure fund is completely separate from the portfolio companies in the service fund and is strictly focused on investing in the distressed utilities. Hr'g Tr. 8/8/19, 47:6–13.

21. Gerrity insists that the infrastructure fund is merely a financial transaction that provides funding to distressed entities and that the fund does not take any operational control over the decision-making processes of these entities. He admits that some of those resources may be used

to hire engineering services, but denies that the infrastructure fund would purposefully direct any funds to benefit the portfolio companies. *Id.* at 58:3–13.

22. However, Ardurra first became aware that Gerrity was violating his non-compete agreements because of an email that Gerrity forwarded from an email account "dgerrity@bernhardcapital.com" to his former Ardurra email account a few months after his termination. (Brown Decl. ¶ 34.)

23. Gerrity was one of several recipients on an email sent by an individual with a "berhardcapital.com" email address to dgerrity@bernhardcapital.com and others with the same Bernhard Capital domain. The subject of the email was "Meet Mayor and Council of Fayetteville NC" with the text, "From [Bernhard Capital] it will be Jeff Yuknis and possibly Dan Gerrity/Julius Bedford/Jeff Baudiersent." (*Id.*) For unknown reasons, Gerrity forwarded this email to his Ardurra email account. (*Id.*) Gerrity has received and sent other emails using his Ardurra email address for Bernhard Capital related purposes, including employee benefit account set-up and information pertaining to the infrastructure fund. (*Id.* ¶¶ 35–36.)

24. Because Feyetteville, NC, as well as many other locations that Bernhard Capital does business is within the same geographic region as Ardurra's interests, Ardurra was concerned that Gerrity was in violation of the Purchase Agreement and his Employee Agreement. (Brown Decl. ¶ 30); Hr'g Tr. 8/8/19, 38:18–39:6 (defining Ardurra's territory as the American "northeast and southeast").

25. Ardurra filed their Complaint and Motion for Preliminary Injunction on July 25, 2019, out of fear that Gerrity was attempting to solicit or entice actual and potential customers of Ardurra in his position at Bernhard Capital and to prevent losing its confidential information, strategies, and associated market advantages. (Brown Decl. ¶¶ 38–39.)

6

## II. ANALYSIS

1. The standard for granting a preliminary injunction requires a plaintiff seeking such relief to make a "clear showing" that "[1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)); *see also Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010).

2. In order for the Court to grant a preliminary injunction in favor of Ardurra, Ardurra must show that it will be more likely than not to prove that Gerrity has violated the Purchase Agreement and/or his Employee Agreement. It must also show that it will suffer irreparable harm if Gerrity is allowed to continue to work for Bernhard Capital, namely that it will lose actual and potential customers and confidential information, strategies, and associated market advantages. Ardurra must also show that the balance of equities tips in its favor and that an injunction is in the public interest.

3. Gerrity primarily challenges that he is not engaged in competition with Ardurra in any of Ardurra's areas of business, or, in the alternative, that the non-compete language is not enforceable against Gerrity. (Def.'s Mem. Law in Opp'n 6.)

### A. GERRITY IS IN VIOLATION OF HIS NON-COMPETE AGREEMENTS

4. As to Gerrity's first argument, we found that Ardurra is likely to succeed in proving Gerrity is engaged in impermissible competition.

5. First, although Gerrity insisted during his testimony that his role with Bernhard Capital is solely with the infrastructure fund, it is difficult to understand how Bernhard Capital could

7

ensure there is no cross-over with the service fund. Gerrity is a former CEO and Director of Sales of companies that engage in "consulting engineering," "designing [sewage and water] systems" and structural engineering and landscape architecture projects, and "bidding them out." Hr'g Tr. 8/8/19, 40:23–41:1. This experience is almost identical to the type of services many of the companies in Bernhard Capital's service fund do and there does not appear to be any sort of screening or policing method to prevent Gerrity from assisting these companies. *Id.* at 62:6–16.

6. Likewise, the infrastructure fund provides distressed entities with the resources to, as Gerrity stated in his declaration, "hire companies such as Ardurra to provide ['the types of "services and solutions"'] that Ardurra provides." (Decl. of Daniel Gerrity in Opp'n to Pl.'s Mot. for Prelim. Inj. ¶¶ 19–20.) During the August 8, 2019 Hearing, counsel for Ardurra pressed Gerrity on whether it would be anticipated that the funds provided by Bernhard Capital would be used to hire one of the portfolio companies in the service fund, Gerrity responded, "No . . . we work against that . . . ." Hr'g Tr. 8/8/19, 58:3–13.

7. We did not find this response credible. It is hard to believe that Bernhard Capital would be neutral to, let alone "work against," the possibility that the funds it provides to entities through its infrastructure fund are directed towards any of its portfolio companies in its service fund. Funneling money, directly or indirectly, from the infrastructure fund to the portfolio companies would be in conflict with Gerrity's obligations under the Employee Agreement and Purchase Agreement. However, the Court is open to any evidence showing a Bernhard Capital policy or directive to ensure funds from the infrastructure fund do not benefit any of the portfolio companies.

8. Second, Gerrity is, at the very least, indirectly benefitting Bernhard Capital's portfolio companies through his work on the infrastructure fund.

8

9. Ardurra argued at the August 8, 2019 Hearing that "the non-compete doesn't relate to whether or not he's providing engineering services. It relates to whether he's either engaged or assisting others in engaging in the restricted business." *Id.* at 77:10–14.

10. We agree. By selecting worthwhile investments in the infrastructure fund, Bernhard Capital makes money that could then be used to invest in new or existing portfolio companies in the service fund. Therefore, Gerrity's role with the infrastructure fund could ultimately end up benefitting competitors to Ardurra in direct conflict with Gerrity's obligations under the Employee Agreement and Purchase Agreement.

    **B. THE NON-COMPETE AGREEMENTS ARE ENFORCEABLE**

11. As to Gerrity's second argument, in order for a non-compete to be enforceable, it must (1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities. *See Concord Steel, Inc. v. Wilmington Steel Processing Co.*, No. 3369, 2008 WL 902406, *4 (Del. Ch. Apr. 3, 2008); *see also Volunteer Firemen's Ins. Servs., Inc. v. Cigna Prop. and Cas. Agency*, 693 A.2d 1330, 1337 (Pa. Super. Ct. 1997) (analyzing enforceability under similar test: "(1) ancillary to the main purpose of a lawful transaction; (2) necessary to protect a party's legitimate interest; (3) supported by consideration; and (4) appropriately limited as to time and territory").[1]

---

[1] We note there is discrepancy as to the applicable law in this case. There appears to be a consensus among the parties that the Purchase Agreement is controlled by Delaware law, but that the Employee Agreement is controlled by either Delaware law, Pennsylvania law, or Florida law. Hr'g Tr. 8/8/19, 22:23–23:2 (Gerrity asserting Delaware law covers Purchase Agreement); 29:22–30:2 (Ardurra arguing the Purchase Agreement is valid under Delaware law); 26:21–25 (Gerrity arguing Employee Agreement is controlled by Florida law). For the purpose of deciding this motion, we note that the laws are substantially similar and that we analyze the facts primarily under Delaware law, as the Purchase Agreement is a four-year term and will be more relevant as this case proceeds since the Employee Agreement appears to conclude in March 2020.

12. Gerrity challenged that: (1) the geographic scope is overly broad; (2) the restrictive covenants are not necessary to protect Ardurra's legitimate interests; and (3) the balancing of equities disfavors the application of the non-compete language. (Def.'s Mem. Law in Opp'n 6–9.)

13. Initially, we dismissed Gerrity's geographic argument. Gerrity argued that the non-compete agreements refer to a "worldwide" territory, which Gerrity believes is overly broad and heavily disfavored under Pennsylvania and Delaware law. (*Id.* at 6–7.) According to Gerrity, neither he nor Ardurra has a "nationwide, let alone a worldwide, footprint." (*Id.* at 7.)

14. However, in granting the present injunction, we did not need to consider the enforceability of the most outer limits of non-compete geographic language. It has been clearly demonstrated, both in the briefings and at the August 8, 2019 Hearing, that the relevant geographic scope is much more limited. Under Delaware law, a covenant not to compete "will be enforced by the court only if the covenant is positively expressed. Even then, it will be narrowly construed." *See Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861, 876 (D. Del. 1987).

15. Much of Ardurra's focus is on territories including the "American South, in Texas through the Carolinas." (Brown Decl. ¶ 30); Hr'g Tr. 8/8/19, 38:18–39:6 (defining Ardurra's territory as the American "northeast and southeast") One of Gerrity's first projects at Bernhard Capital involved a meeting with the Mayor and City Council of Fayetteville, North Carolina. (Brown Decl. ¶ 34.)

16. Therefore, construing the geographic scope of the non-compete agreements as narrowly as possible, we found that the non-compete agreements were enforceable at least to the relevant regions at issue. *See Kellam Energy*, 668 F. Supp. at 876.

17. Next, Gerrity argued that the non-competes are not necessary to protect Ardurra's legitimate interests because he "has moved out of the engineering game entirely [and] into the investment realm . . . ." (Def.'s Mem. Law in Opp'n 8.) He again raised the issue that his work for Bernhard Capital is focused on "provid[ing] funding for the types of services/solutions that Ardurra offers." (*Id.*)

18. As we detailed above, Gerrity has not provided adequate assurances that his work with the infrastructure fund does not crossover into the service fund. Likewise, there is a significant risk that his work strictly on the infrastructure fund will still indirectly benefit the portfolio companies in the service fund.

19. Gerrity noted that if we enforce the non-compete agreements on his current role, it will be effectively impossible for him to be employed anywhere in the infrastructure realm. (*Id.*) However, we need not comment on any future or potential opportunities in the infrastructure realm, but rather focus on the specific facts of this case, including Bernhard Capital's fund structures. *See Bimbo Bakeries*, 613 F.3d at 118–19 ("[A] temporary restriction on . . . employment is warranted where, as here, the facts demonstrate that the restriction is necessary to prevent greater irreparable harm from befalling another party.").

20. Finally, Gerrity argued that the Ardurra would not suffer "irreparable injury" if the injunction was denied, but that greater harm would result for Gerrity if the injunction was granted. (Def.'s Mem. Law in Opp'n 11–12.) We disagree. Ardurra could quite clearly lose bids on prospective infrastructure projects to one of Bernhard Capital's portfolio companies if Bernhard Capital and Gerrity were funding a particular project. Of course, that's not to say Ardurra is guaranteed to otherwise win such bids, but Ardurra clearly negotiated fair and adequate compensation to prevent Gerrity from competing against it.

21. Meanwhile, Gerrity is no worse off if enjoined than he was before he started the job at Bernhard Capital. While it is true that he is prevented from working at, and collecting a salary from, Bernhard Capital, Ardurra paid him $4,330,854.00 under the Purchase Agreement to, in part, prevent him from working for a period of four years. He also earned a salary while employed at Ardurra under the Employee Agreement, with the understanding that he was bound by a non-compete agreement for a period of one year following his departure.

22. Therefore, we found that the non-compete agreements are enforceable against Gerrity and the preliminary injunction is granted.

### III. CONCLUSION

For the reasons set forth above, we concluded that Ardurra has established that it is more likely than not to prove that Gerrity has violated the Purchase Agreement and/or his Employee Agreement. Ardurra has also shown that it will suffer irreparable harm if Gerrity is allowed to continue to work for Bernhard Capital; namely, that it will lose actual and potential customers and confidential information, strategies, and associated market advantages. Finally, Ardurra has also shown that the balance of equities tips in its favor and that an injunction is in the public interest. Therefore, we granted the preliminary injunction pursuant to the Court's November 5, 2019 Memorandum Order and Gerrity is currently "prohibited from being employed by or performing work for or on behalf of Bernhard [Capital] and its portfolio and related companies and funds." (Doc. No. 23.)

BY THE COURT:

/s/ Robert F. Kelly
ROBERT F. KELLY
SENIOR JUDGE